# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GERALD NARDELLA, on behalf of himself and
all others similarly situated,

              Plaintiff,

      v.

MERCEDES WALTON, GERALD F. MAASS,
JILL M. TAYMANS, EDWARD
MODZELEWSKI, FREDERICK C. S.
WILHELM, WANDA D. DEARTH,
JUNIOR WINOKUR, DANIEL D. RICHARD,
RONALD RICHARD, CHARLES D. NYBERG,
JOHN V. HARGISS, CRYO-CELL
INTERNATIONAL, INC., WEINICK
SANDERS LEVENTHAL & CO., LLP, and
MIRSKY, FURST & ASSOCIATES, P.A.,

              Defendants.

8:03-CV-1285-T-30TGW

## CLASS ACTION COMPLAINT

Plaintiff alleges the following, except as to facts specifically pertaining to them, based upon his counsel's investigation, which included an analysis of publicly-available news articles and reports, public filings, press releases and other matters of public record, and consultation with a forensic accountant.

## NATURE OF THE ACTION

1.     This is a class action on behalf of all purchasers of the common stock of Cryo-Cell International, Inc. ("Cryo-Cell" or the "Company") between March 16, 1999 and May 20, 2003 (the

"Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       Defendant Cryo-Cell is based in Clearwater, Florida and is engaged in the business of cryogenic storage and the design and development of cellular storage devices. The Company promises to "freeze" blood taken from newborns' umbilical cords so that the large number of stem cells believed to be present in such blood will be available to an individual later in life when these stem cells may be used to cure certain diseases, including cancer. The Company attempts to preserve the umbilical cord stem cells and charges a start-up fee and a monthly service fee to its customers to maintain the stem cells.

3.       Throughout the Class Period, defendants issued numerous false financial statements that artificially inflated reported revenues, earning, and assets. Specifically, the Company repeatedly recognized revenue in violation of generally accepted accounting principles ("GAAP"), including the Company's own internal accounting principles; maintained worthless assets on its balance sheets as collectible receivables; and failed to disclose related party transactions, among other things.

4.       Beginning on March 16, 1999, with the filing of its Form 10-K for fiscal year 1998 (for fiscal year ended November 30, 1998), each and every periodic and annual report filed with the SEC contained materially false financial statements, for at least the following reasons:

a.       The Company failed to disclose a related party transaction in connection with its revenue-sharing agreement with defendant Nyberg;

b.       The Company failed to timely write-off the value of receivables from two investors in a revenue-sharing agreement related to the Company's anticipated revenues in New Jersey;

-2-

c.    The Company improperly recognized revenue on several transactions in connection with its granting of licenses to third parties to market the Company's services in areas outside the United States, including area licenses for Europe, the Middle East/Turkey and Mexico. In one transaction, for example, the Company received $1.4 million from Cryo-Cell Europe for an area license covering Europe, but "invested" $1 million to buy an interest in Cryo-Cell Europe arbitrarily agreed upon as giving Cryo-Cell a 6% interest in that company. In substance, however, Cryo-Cell Europe was only paying $400,000 for the European license as defendants well knew. The Company, however, improperly recognized all of the $1.4 million as income on its financial statements; and

d.    The Company intentionally or recklessly overstated the value of is investment in Cryo-Cell Italia, S.r.l.

5.    Cyro Cell's auditors also engaged in the fraud and issued clean audit opinions for the Company's fiscal years from 1999 to 2002, despite numerous red flags and suspicious transactions that they either knew about and ignored or recklessly disregarded. The auditors' clean audit opinions were contained in the Company's SEC-filed annual reports and were disseminated to the investing public.

6.    In June 2002, defendant Daniel D. Richards resigned as CEO and Chairman of the Board. Richards stepped down and became CEO of Cryo-Cell's subsidiary, Stem Cell Preservation Technologies, Inc. ("SCPT"). Richards was rewarded with a handsome severance package and the board's blessing, even after presiding over a company with four years' worth of materially false financial statements: he received a $250,000 retirement bonus, conditional options to purchase up

to 200,000 shares of Cryo-Cell stock, and a 10-year "consulting agreement" with an annual salary of $200,000 and which is payable to his trust if he predeceases the 10-year consulting period.

7.      The Company filed its Form 10-KSB, disclosing that an appraisal had been done on some of the Company's assets, and that as a result, the Company's investments in Cryo-Cell Italia, S.r.l., among other investments, was impaired. On April 14, 2003, the Company announced that it was considering whether it would restate its financial statements in light of certain now-perceived revenue recognition problems.

8.      The final shoe dropped on May 20, 2003, the end of the Class Period, when, after the market's close, Cryo-Cell announced that Ernst & Young LLP, its newly-approved auditor, had resigned as the Company's auditor. The Company also announced that it was working with its former auditor on its anticipated restatement of financial results.

9.      During the Class Period, the Company's stock hit a high of about $12, and for much of that time it traded in the $4-$6 range. The stock currently trades at $1.12.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud were committed within this District and Cryo-Cell maintains its principal executive offices in this District.

-4-

13.    In connection with the acts and omissions alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.    Plaintiff purchased Cryo-Cell common stock during the Class Period, as set forth in the accompanying certification which is incorporated herein by reference, and was damaged thereby.

15.    Defendant Cryo-Cell is engaged in cryogenic storage and design and development of cryogenic storage devices used in its storage programs. Its principal executive offices are located at 3165 McMullen Booth Road, Clearwater, Florida.

16.    Defendant Weinick Sanders Leventhal & Co., LLP ("Weinick Sanders") is a public accounting firm located in New York, New York. Weinick Sanders is the successor firm to defendant Mirsky, Furst and Associates, P.A. ("Mirsky Furst"). Weinick Sanders (and its predecessor Mirsky Furst) knowingly or recklessly issued false and misleading "clean" audit opinions on Cryo-Cell's financial statements, including the following: Mirsky Furst's March 16, 1999 audit opinion, and Weinick Sanders' audit opinions dated February 4, 2000, February 2, 2001, and February 2, 2002 (except for Note 4 which was dated February 22, 2002). The Company included each of these clean audit opinions in its annual reports on Form 10-K that were filed with the Securities and Exchange Commission ("SEC").

17.    The Individual Defendants served in the capacities listed below, signed the Company's public filings as indicated, and received substantial compensation:

**Name**                          **Position**

| | |
|---|---|
| Mercedes Walton | Director; Interim Chief Executive Officer and Chairman of the Board (6/18/02 to present); 11/30/00 Form 10-KSB; 11/30/01 Form 10-KSB. |
| Gerald F. Maass | Vice President and General Manager; Director; joined Company 3/98; signed 11/30/98 Form 10-KSB; 11/30/99 Form 10-KSB; 11/30/00 Form 10-KSB; 11/30/01 Form 10-KSB. |
| Jill M. Taymans | Principal Financial Officer; joined Company 4/97; signed 11/30/98 Form 10-KSB;11/30/99 Form 10-KSB; 11/30/00 Form 10-KSB; 11/30/01 Form 10-KSB. |
| Edward Modzelewski | Director; signed 11/30/98 Form 10-KSB; 11/30/99 Form 10-KSB; 11/30/00 Form 10-KSB; 11/30/01 Form 10-KSB. |
| Frederick C. S. Wilhelm | Director; signed 11/30/98 Form 10-KSB; 11/30/99 Form 10-KSB; 11/30/00 Form 10-KSB; 11/30/01 Form 10-KSB. |
| Wanda D. Dearth | President and Chief Operating Officer; Director; signed 11/30/00 Form 10-KSB. |
| Junior Winokur | Director; signed 11/30/00 Form 10-KSB. |
| Daniel D. Richard | Chief Executive Officer and Chairman of the Board until 6/18/02; Company founder; CEO of majority-owned subsidiary, SCPT; signed 11/30/98 Form 10-KSB; 2/28/99 Form 10-QSB; 5/31/99 Form 10-QSB; 8/31/99 Form 10-QSB; 11/30/99 Form 10-KSB; 2/29/00 Form 10-QSB; 5/31/00 Form 10-QSB; 8/31/00 Form 10-QSB; 11/30/00 Form 10-KSB; 2/28/01 Form 10-QSB; 5/31/01 Form 10-QSB; 8/31/01 Form 10-QSB; 11/30/01 Form 10-KSB; 2/28/02 Form 10-QSB. |
| Ronald Richard | Director; former CEO of Company's majority-owned subsidiary SCPT; signed 11/30/00 Form 10-KSB; 11/30/01 Form 10-KSB. |
| Charles D. Nyberg | Director; signed 11/30/01 Form 10-KSB. |
| John V. Hargiss | Chief Executive Officer (6/18/02 to 4/8/03); Director; joined Company 2/02; signed 11/30/01 Form 10-KSB; 5/31/02 Form 10-QSB; 8/31/02 Form 10-QSB. |

18.     The Individual Defendants, as Cryo-Cell's senior officers and/or directors were controlling persons under the Exchange Act because they exercised their power and influence to cause Cryo-Cell to engage in the fraudulent practices alleged herein.

19.     Defendants are liable as participants in a fraudulent scheme and course of business that defrauded and deceived Cryo-Cell common-stock purchasers. Defendants deceived the investing public regarding Cryo-Cell's business, finances and the intrinsic value of its common stock, and caused plaintiff and other class members to purchase Cryo-Cell common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3), Fed. R. Civ. P., on behalf of a Class consisting of all persons who purchased Cryo-Cell common stock between March 16, 1999 and May 20, 2003, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, members of the Individual Defendants' immediate families, any subsidiary or affiliate of Cryo-Cell and the directors, officers and employees of Cryo-Cell or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

21.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States. As of May 2003, there were reportedly more than 12 million shares of Cryo-Cell common stock outstanding. Throughout the Class Period, *Cryo-Cell* common stock has been actively traded on the Nasdaq Small Cap market *(an open and*

efficient market) under the symbol "CCELE." Record owners and other class members may be identified from records maintained by Cryo-Cell and/or its transfer agents and may be notified of this action's pendency by mail, using a form of notice customarily used in securities class actions.

22.    Plaintiff's claims are typical of other Class members' claims because the Class was similarly affected by defendants' wrongful conduct in violation of federal law as alleged herein.

23.    Plaintiff will fairly and adequately protect the Class members' interests and has retained counsel competent and experienced in class and securities litigation.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b.    whether defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Cryo-Cell;

d.    whether defendants' statements to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Cryo-Cell;

-8-

e.    whether the market price of Cryo-Cell common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.    the extent to which Class members have sustained damages and the proper measure of damages.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in managing this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

26.    The Class Period begins on March 16, 1999, the date the Company filed its annual-report on Form 10-KSB for the fiscal year ended November 30, 1998 (the "Fiscal 1998 Form 10-KSB"). As alleged below, the Company's reported revenues and income in its 1998 Annual Report were materially false and misleading due to undisclosed related-party transactions. (FASB Statement No. 57 (defining "related-party transactions")). As a result, the Company also carried inflated revenue and income figures into later reporting periods, materially distorting and inflating these subsequent financial reports.

**A.    Cryo-Cell Improperly Recognized Material Amounts
of Revenue Through the Arizona/Florida Related-Party Transactions**

27.    According to the Company's public filings, as of February 28, 1995, Cryo-Cell had entered into a contract to share its revenues with two private investors. The investors were entitled

to 50% of the net revenues from all of the Company's cellular storage activities in the state of Arizona. In exchange, the Company was to receive $1,800,000 in negotiable demand notes to be paid in annual installments of $450,000, plus interest at the prime rate, beginning on April 30, 1996.

28.    The parties later entered a restructuring agreement under which the April 30, 1996 installment of $450,000 was accelerated, making payment due in January 1996. The investors agreed to this acceleration of their installment payment **in exchange for the Company's payment of future revenues generated from the Company's Lifespan/service mark/Program**. The Company described this program as one under which the Company obtained storage revenues from medical centers that worked with Cryo-Cell.

29.    The Company's Fiscal 1998 Form 10-KSB, filed March 16, 1999, disclosed that on February 9, 1999, the agreements with the Company's Arizona revenue sharing partners were modified as follows:

a.    The Company canceled the Arizona arrangement and replaced it with a similar Florida arrangement;

b.    The Company reduced the fee it was to receive from the two investors from $1,800,000 to $1,000,000;

c.    The Company credited the revenue-sharing partners for the $450,000 which they previously paid, leaving a balance of $550,000;

d.    The Company canceled "the investors' previous obligation to provide the Company with $675,000 plus accrued interest;" and

e.    The Company gave the revenue-sharing partners a five-year option to purchase 100,000 shares of the Company's common stock at an exercise price of $2.50 per share.

-10-

30.    Cryo-Cell's Fiscal 1998 Form 10-KSB was materially false and misleading because it failed to disclose that the Arizona/Florida transaction was a related party transaction and that, had it been an arms-length transaction, the generous benefits conferred in the restructured agreement described above in (a) though (e) would not have occurred.  The related party at issue was later identified by the Company as defendant Charles D. Nyberg.

31.    According to FASB Statement No. 57, "[A]s part of Accounting Series Release No. 280, General Revisions of Regulation S-X, the Securities and Exchange Commission integrated the disclosure requirements . . . pertaining to related party transactions into Regulation S-X." FASB No. 57 also mandates that financial statements "shall include disclosures of material related party transactions and that such disclosures shall include a description of the transactions, including transactions in which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements."

32.    Because this information was not provided, the investment community had no way of knowing that the initial February 28, 1995 transaction was a sham; that the revenue-sharing partners did not undertake actual revenue generating activities in the state of Arizona; that the February 28, 1995 transaction was effected solely to inflate the Company's recorded earnings; that the revenue recognized in connection with the transaction should have been reversed as of the beginning of the Class Period; and that Cryo-Cell's income was overstated by $450,000 as of November 30, 1998 due to the Company's failure to reverse the improperly recognized related-party revenue.  For all of these reasons, Cryo-Cell's Fiscal 1998 Form 10-KSB was materially false and *misleading*.

-11-

33.     The Company's financial statements, press releases, and SEC filings during the Class Period continued to be materially false and misleading because the recognition of the Arizona/Florida related party revenue was not reversed and because defendants continued to conceal the truth about the related-party transaction.  As a result, the Company's revenue and income continued to be overstated in material amounts in periodic and annual reports filed during the Class Period.  The following disclosure reports Cryo-Cell filed with the SEC were materially false and misleading as a result of the above-described related-party scheme: the Company's November 30, 1998 Form 10-KSB, February 28, 1999 Form 10-QSB, May 31, 1999 Form 10-QSB, August 31, 1999 Form 10-QSB, November 30, 1999 Form 10-KSB, February 29, 2000 Form 10-QSB, May 31, 2000 Form 10-QSB, August 31, 2000 Form 10-QSB, November 30, 2000 Form 10-KSB, February 29, 2001 Form 10-QSB, May 31, 2001 Form 10-QSB, August 31, 2001 Form 10-QSB, November 30, 2001 Form 10-KSB, February 28, 2002 Form 10-QSB, May 31, 2002 Form 10-QSB, and August 31, 2002 Form 10-QSB.

**B.      Cryo-Cell Knew or Recklessly Disregarded that it Should Not Have Recognized Revenue Under the New Jersey Revenue-Sharing Transaction**

34.     During the Class Period, the Company recognized material amounts of revenue and profit, in violation of GAAP and the Company's own stated accounting policy.  Cryo-Cell's stated accounting policy on revenue sharing agreements was as follows: "Revenue is recognized when the Company enters into a Revenue Sharing Agreement and the payment pursuant to the agreement has been satisfactorily assured."

35.     This conformed to the SEC's own formulation in Accounting And Auditing Enforcement Release No. 812 (September 5, 1996): "Generally Accepted Accounting Principles

-12-

provide that revenue should not be recognized until an exchange has occurred, the earnings process is complete, <u>and the collection of the sales price is reasonably assured</u>." In addition, according to the SEC, collectibility must be probable before revenue may be recognized. (FASB Concepts Statement No. 5) ("If collectibility of assets received for product, services, or other assets is doubtful, revenues and gains may be recognized on the basis of cash received.").

36.    The Company improperly recognized $500,000 of revenue in connection with a purported New Jersey revenue-sharing transaction.

37.    On February 28, 2000, the Company filed its Form 10-KSB with the SEC for the fiscal year ended November 30, 1999 (the "Fiscal 1999 Form 10-KSB"). This filing described a transaction with "two investors" pursuant to which Cryo-Cell recognized $500,000 of revenue **on the last day of the Company's fiscal year**:

> On November 30, 1999, the Company entered into agreements with two investors entitling them to on-going shares in a portion of the Company's net storage revenue generated by specimens originating from within the state of New Jersey. **Deposits totaling $50,000 were received upon signing of the agreements and the remaining $450,000, due in May 2000**, is recorded as a receivable. When the $450,000 is received by the Company the investors will be entitled to a portion of net storage revenues generated to a maximum of 33,000 storage spaces . . . The most recent Revenue Sharing Agreement was recognized during fiscal Fourth Quarter, 1999.

38.    The Company did not receive the $450,000 due in May 2000 as the agreement required, and in May 2000, the parties modified the agreement to extend the investors' date to pay the remaining $450,000 *to April 2001*. (Form 10-KSB for the fiscal year ended November 30, 2000 (the "Fiscal 2000 Form 10-KSB")) ("Deposits totaling $50,000 were received upon signing of the

-13-

agreements and the remaining $450,000, was originally due in May 2000. **In May 2000 the original due date for the remaining balance was extended to April 2001**.").

39.     On April 14, 2001, the Company filed its Form 10-QSB for the fiscal quarter ended February 28, 2001 with the SEC (the "February 28, 2001 Form 10-QSB"). Cryo-Cell's filing reaffirmed that: "**In May 2000 the original due date for the remaining balance was extended to April 2001**."

40.     The investors' obligation was still unpaid in April 2001. The Company filed its Form 10-QSB for the fiscal quarter ended May 31, 2001 with the SEC (the "May 31, 2001 Form 10-QSB") stating:

> Deposits totaling $50,000 were received upon signing of the agreements and the remaining $450,000 was originally due in May 2000. **In May 2000 the original due date for the remaining balance was extended to August 2001**. As of May 31, 2001 the remaining balance due is $370,000.

41.     The investors' obligation was unpaid in August 2001, and the Company filed its Form 10-QSB for the fiscal quarter ended August 31, 2001 with the SEC (the "August 31, 2001 Form 10-QSB") stating:

> Deposits totaling $50,000 were received upon signing of the agreements and the remaining $450,000 was originally due in May 2000. **In May 2000 the original due date for the remaining balance was extended to November 2001**. As of August 31, 2001 the remaining balance due is $370,000.

42.     On March 15, 2002, the Company filed its Form 10-KSB with the SEC for the fiscal year ended November 30, 2001 (the "Fiscal 2001 Form 10-KSB"), which stated:

> At November 30, 1999, the Company entered into agreements with two investors entitling them to on-going shares in a portion of CRYO-CELL's net storage revenue generated by specimens

-14-

originating from within the state of New Jersey for a price of $500,000. Deposits totaling $130,000 have been received through November 30, 2001 and the remaining $370,000, **due in August 2002**, is recorded as a receivable.

43.     On October 21, 2002, the Company filed its Form 10-QSB for the fiscal quarter ended August 31, 2002 with the SEC (the "August 31, 2002 Form 10-QSB"). With regard to the New Jersey Revenue Sharing Agreement, the filing stated that:

> As of August 31, 2002, the Company received $130,000. The agreement originally required the notes to be paid in full by May 31, 2000. The Company had extended the payment terms of these notes to August 31, 2002. The Company did not receive the final payment due. In conversations with the two investors, the Company was informed that they were unable to pay the notes. **The Company is in the process of foreclosing and has deemed this receivable to be uncollectible. The remaining [$370,000] balance due under the terms of the contract has been fully reserved and charged to operations.**

44.     Payment to the Company under the New Jersey Revenue Sharing Agreement was never "satisfactorily" or "reasonably assured." Accordingly, the Company's recognition of $500,000 in revenue as of November 30, 1999 violated GAAP and the Company's own stated accounting policy.

45.     The Company's last minute, fourth-quarter revenue injection materially inflated reported revenue and earnings for the fourth quarter and for the fiscal year ended November 30, 1999.

46.     Because the Company did not reverse this improperly recorded revenue during the Class Period through a charge to earnings, all of its subsequently-filed financial statements continued to be materially misstated. As a result, the following financial reports were materially false and *misleading*: the Company's November 30, 1999 Form 10-KSB, February 29, 2000 Form 10-QSB,

May 31, 2000 Form 10-QSB, August 31, 2000 Form 10-QSB, November 30, 2000 Form 10-KSB,

February 28, 2001 Form 10-QSB, May 31, 2001 Form 10-QSB, August 31, 2001 Form 10-QSB,

November 30, 2001 Form 10-KSB, February 28, 2002 Form 10-QSB, and May 31, 2002 Form 10-

QSB.

C.    **Cryo-Cell's Sham Recognition of Revenue for the Sale of Area Licenses**

     (i)    **The Sham Revenues from the European License**

47.    Cryo-Cell also improperly recognized $1.4 million through a sham transaction in

connection with the sale of a license to market its services in Europe, as alleged below.

48.    When licenses are sold pursuant to a payment plan exceeding one year, there is a

presumption (AICPA Statement Of Position 97-2) that collection of the sales price is not reasonably

assured and, accordingly, revenue may not be recognized.

49.    On November 29, 1999, the Company issued a press release announcing the launch

of a "European Expansion Program:"

> Daniel D. Richard, Chairman and Chief Executive Officer of
> CRYO-CELL, announced today that a Letter of Intent has been
> signed with the Managing Director of CRYO-CELL Holdings (a
> corporation in the process of being formed). CRYO-CELL Holdings
> will have the exclusive rights to market CRYO-CELL's services
> throughout Continental Europe. Processing and laboratory facilities
> will be set up in a number of countries. The first group will be
> CRYO-CELL Belgium in Brussels, CRYO-CELL Netherlands in
> Amsterdam and CRYO-CELL Switzerland in Geneva.
>
> For the marketing rights in Europe, CRYO-CELL is to receive a
> **guaranteed payment** of $1.4 million. An initial deposit of $100,000
> has been paid to CRYO-CELL. **The scheduled payments of the
> remaining $1,300,000 will be completed within one year of
> signing the formal agreement.**

In addition to the $1,400,000, CRYO-CELL is to receive an on-going percentage of all net revenues from the processing and accumulating fees for storage of umbilical cord blood, sperm, tumor tissue, stem cells and all related cellular preservation and marketing activities.

In order to stimulate rapid growth in Europe, CRYO-CELL is making available to the CRYO-CELL European participants options to purchase 300,000 shares of the Company's common stock. The exercise price is $8.00 per share for the first 100,000 shares, $10.00 for the second 100,000 shares and $12.00 for the final 100,000 shares. All shares must be held for a minimum of one year after exercise.

50.     On April 6, 2000, the Company entered into a renewable agreement with COLTEC, Ltd. for the exclusive license to market the Company's U-CORD program in Europe, sell revenue sharing agreements or further sub-license the marketing rights throughout Europe.

51.     COLTEC, Ltd. formed a corporation, CRYO-CELL Europe, N.V. ("CCEU" or "CRYOC") to engage in the cryogenic cellular storage business under the agreement, and assigned its rights and obligations under this agreement to CRYOC.

52.     The Company received a payment of $100,000 in November 1999 and, as of August 31, 2000, the Company had received payments aggregating only $800,000.

53.     Because CRYOC was a start-up operation with limited capital and was unable or unwilling to make the remaining license payments, defendants devised a scheme to provide CRYOC with the money needed to pay for the license, so that the Company could immediately recognize a material amount or revenue on its financial statements.

54.     On September 19, 2000, the Company purchased a 6% equity position in CRYO-CELL Europe for $1,000,000. The Company made a $500,000 payment when the agreement was signed and a $500,000 payment after Cryo-Cell Europe had paid its outstanding $600,000 balance.

-17-

55.    *This financing arrangement enabled the Company to recognize $465,000 and $700,000 of the licensing fees in fiscal 2000 and fiscal 2001, respectively*. It was plain from the substance of the transaction, however, that the Company only actually received $400,000 for the sale of a license allowing Cryo-Cell Europe to market in Europe.

56.    The $1 million the Company paid for the 6% interest in CRYOC constituted a grossly overvalued purchase price because it bore no relationship to the underlying worth of the 6% interest in Cryo-Cell Europe, a non-public off-shore start-up company. In addition, the Company paid $1 million for its 6% interest in Cryo-Cell Europe without performing any business appraisal.

57.    The Company's financial statements which appeared in its Fiscal 2000 Form 10-KSB reflected the Company's $1 million investment in CRYOC as an "other asset" and represented that "the carrying values of the Company's other assets and liabilities approximated their estimated fair values." The Company had no basis for this statement, which was materially false and misleading.

58.    The Company obtained another 1% interest in CRYOC through its subsidiary, Stem Cell Preservation Technologies, Inc. ("SCPT"), in fiscal 2001 for an additional $150,000.

59.    The fact that a 1% interest in CRYOC was valued at $150,000 during fiscal 2001 and that a 6% interest in CRYOC was valued at $1,000,000 during fiscal 2000 was evidence of either an arbitrary assignment of cost or an apparent impairment which the Company ignored in its Fiscal 2000 Form 10-KSB: "Long-lived assets and identifiable intangibles to be held and used are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable as proscribed under Statement of Financial Accounting Standards No. 121..."

60.    Because the improperly recorded license revenue was not reversed during the Class Period through a charge to earnings, all of the Company's subsequently-filed financial *statements*

-18-

disseminated to the investing public were materially false and misleading. Similarly, because the Company did not correct the inflated carrying value of the Company's recorded investment in CRYOC through a charge to earnings, all of the Company's subsequently-filed financial statements were materially false and misleading. These false financial statements were contained in the following Company filings: the Company's November 30,1999 Form 10-KSB, February 29, 2000 Form 10-QSB, May 31, 2000 Form 10-QSB, August 31, 2000 Form 10-QSB, November 30, 2000 Form 10-KSB, February 28, 2001 Form 10-QSB, May 31, 2001 Form 10-QSB, August 31, 2001 Form 10-QSB, November 30, 2001 Form 10-KSB, February 28, 2002 Form 10-QSB, May 31, 2002 Form 10-QSB, and August 31, 2002 Form 10-QSB.

(ii)    **The Investment in Cryo-Cell Italia is Carried at an Inflated Value**

61.    On August 29, 2001, the Company purchased from CRYOC a 21.9% equity interest in Cryo-Cell Italia, S.r.l. ("Italia"), "**a yet to be formed** umbilical cord blood bank entity" for $1,800,000.

62.    In October 2001, the Company acquired a 2.19% interest in Italia from CRYOC for $150,000, through its subsidiary SCPT.

63.    The fact that a 21.9% interest in "**a yet to be formed" company** was valued at $1,800,000 in August 2001, whereas a 2.19% interest in Italia was valued at $150,000 two months later is strong evidence of an arbitrary assignment of cost bearing no relationship to the investments' worth.

64.    On February 28, 2003, the Company filed its Form 10-KSB with the SEC for the fiscal year ended November 30, 2002 ("the Fiscal 2002 Form 10-KSB"). It reflected that an appraisal of the Company's investments in Italia and CRYOC was finally performed *in February*

-19-

2003 and that, based upon these appraisals, the Company's investments were impaired. A write off of these investments was taken for $1,881,833.

65. The financial statements presented in the Company's August 31, 2001 Form 10-QSB reflected an "Investment in European Affiliates" in the sum of $2,800,000. This sum was materially inflated, as were the amounts reflected as "Investment in European Affiliates" in succeeding financial statements the Company disseminated to the investing public.

66. Because the overstated "Investment in European Affiliates" was not corrected through a charge to earnings during the Class Period, all of the Company's subsequently-filed financial statements were materially false and misleading, including those presented in the Company's November 30, 2001 Form 10-KSB, February 28, 2002 Form 10-QSB, May 31, 2002 Form 10-QSB, and August 31, 2002 Form 10-QSB.

(iii) **The Company Improperly Recognized Revenue on its Middle East/Turkey License**

67. The Company's Fiscal 2001 Form 10-KSB states that, in October 2001, the Company sold an "area" license to market the Company's U-CORD program in Israel, the Middle East, and Turkey for $1 million as follows:

> On August 15, 2001, the Company entered into an agreement with CRYO-CELL Israel for the exclusive license to market the Company's U-Cord program in Israel. The total cost of the license is $500,000, which will be recognized by the Company over a three-year period . . . In addition the Company agreed to the sale of 50,000 warrants at $1.00 each to purchase shares of CCEL at $9.00 per share over the next five years. As of November 2001, the Company received the deposit of $50,000 and $50,000 for the purchase of the warrants.

*****

-20-

On August 15, 2001, the Company entered into an agreement with CRYO-CELL Middle East, Inc. (CME) for the exclusive license to market the Company's U-Cord program in the Middle East and Turkey. The total cost of the license is $500,000, which will be recognized by the Company over a three-year period . . . In addition the Company agreed to the sale of 50,000 warrants at $1.00 each to purchase shares of CCEL at $9.00 per share over the next five years. As of November 2001, the Company received the deposit of $50,000 and $50,000 for the purchase of the warrants. The remainder of the payments are due to be paid in four installments over a three-year period.

If, after payment of any monies towards the portion of the License for the Middle East and Turkey, CME determines that it no longer wants to operate in these countries, CME may void the portion of the License for the Middle East and Turkey within one year from the date of the agreement. In this case all of the monies paid by CME will be applied to the Israel portion of the License fees.

*****

The agreement provides for the Company to receive $1,000,000, (allocated $500,000 to Israel and $500,000 to Turkey and the Middle East), of which it received $100,000 in fiscal 2001 and the balance being payable in three installments of $200,000 due July 2002, February 2003 and November 2003 and one installment of $300,000 due July 2004. The Company is also entitled to licensing fees of 10.5% to 18% of adjusted U-CORD processing and storage revenues to be generated in the Licensed Area as well as 10% from the money received by CCEL ME for the granting of sub-licenses. CCEL ME has up to one year to terminate the Turkey and Middle East portion of this agreement. The Company is required to train and provide technical and marketing support to CCEL ME. **As of November 30, 2001, little, if any, of the obligations of the Company were performed.** In addition, the Company sold 50,000 of its common stock warrants ($1.00 each) in fiscal 2001, expiring July 9, 2006, to the chief operating officer of CCEL ME and an entity affiliated to him to purchase an equal number of common shares of the Company at a strike price of $9.00. **The Company did not recognize licensing fee revenue in fiscal 2001 with respect to this agreement.**

68.     On April 15, 2002, the Company filed its Form 10-QSB with the SEC for the quarter ended February 28, 2002 ("the February 28, 2002 Form 10-QSB"). This document notes that,

although the Company received only $100,000 as an initial payment, **the Company recognized $125,000 as licensing fee income for the three-month period ended February 28, 2002** in connection with this "area" license.

69. On October 21, 2002, the Company filed its Form 10-QSB with the SEC for the quarter ended August 31, 2002 ("the August 31, 2002 Form 10-QSB"). This document stated, with regard to the "area" license:

> The Company received $100,000 of the initial payment in fiscal 2001 and the balance was to be paid in three installments of $200,000 due July 2002, February 2003 and November 2003 and one installment of $300,000 due July 2004. Per the agreement the licensee had the right to cancel the Mid East portion of the agreement and apply all of the $100,000 initial deposit toward the Israel portion of the contract. **The licensee opted to cancel the Mid East license and the Company reduced each of its receivable and unearned income by $500,000.**

> As a result of the geography reapportionment, CCEL ME has informed the Company that they will not be able to pay the remaining portion of the license fee. **The Company in October 2002 has modified the terms of the license in which it has forgiven $100,000 due in July 2002 and will forgive the remaining payments of the contract in exchange for the surrender of the warrants to acquire 100,000 shares of the Company's common stock at an exercise price of $9.00 per share.** The Company and CCEL ME have agreed to terminate these warrants and apply their current value aggregating $1.00 toward the remaining portion of the license fee. The Company had previously recognized $125,000 as licensing fee income. **Due to the proposed revised terms of the contract, $25,000 had to be reversed from Other Income in the current period and at August 31, 2002 the entire receivable of $400,000 and unearned income of $400,000 from the sale of this license has been written-off.**

70. At no time was the payment of the "area" license fee "satisfactorily" or "reasonably assured." Accordingly, the recognition of revenue, in the sum of $125,000 as of February 28, 2002 was inappropriate and in violation of GAAP.

71.    The $500,000 "receivable" which the Company recorded in connection with the Mid East license never existed because, in substance, only an option was granted.  The recordation of a material amount of receivables rendered the Company's financial statements materially false and misleading.

72.    SEC Staff Accounting Bulletin No. 101, <u>Revenue Recognition in Financial Statements</u>, states:

> In licensing and similar arrangements (e.g., licenses of motion pictures, software, technology, and other intangibles), **the staff believes that delivery does not occur for revenue recognition purposes until the license term begins.**  Accordingly, if a licensed product or technology is physically delivered to the customer, but the license term has not yet begun, revenue should not be recognized prior to inception of the license term. Upon inception of the license term, revenue should be recognized in a manner consistent with the nature of the transaction and the earnings process.

73.    Because the Company had not provided training and technical and marketing support as required by the "area" licensing agreement, "delivery" had not occurred, and the license term had not begun.  Accordingly, revenue recognition was also improper and in violation of GAAP as set forth in SEC Staff Accounting Bulletin No. 101.

74.    The Company's financial statements which appeared in the Fiscal 2001 Form 10-KSB purported to contain notes describing the Company's significant accounting policies. ***But these notes failed to disclose the Company's accounting policy with regard to the recognition of license revenue***, in contravention of GAAP (APB Opinion No. 22) which provides that:

> Disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the determination of financial position, changes in financial position, or results of operations. **In general, the disclosure should encompass**

-23-

important judgments as to appropriateness of principles relating
to recognition of revenue.

(iv)     **The Company Prematurely Recognized**
        **Revenue On Its Mexico License Agreement**

75.     The May 31, 2001 Form 10-QSB stated that the Company entered into an agreement

for the exclusive license to market the Company's U-Cord program in Mexico "on June 13, 2001"

and that "the total cost of the license is $900,000." Additionally, the May 31, 2001 Form 10-QSB

stated that an initial deposit of $100,000 was received in June 2001 and that "the remainder of the

payments is due to be paid in three installments over a two-year period."

76.     The August 31, 2001 Form 10-QSB disclosed that the Mexico license agreement was

revised "during October 2001" and that "the initial cost of the license was reduced to $600,000."

77.     As disclosed in the Fiscal 2001 Form 10-KSB, only $200,000 of the "reduced"

$600,000 license fee was paid as of November 30, 2001 and, nevertheless, $500,000 of license fee

revenue was recognized. According to this document:

> On June 13, 2001, the Company entered into an agreement for the
> exclusive license to market the Company's U-Cord program in
> Mexico. The license allows CRYO-CELL de Mexico to directly
> market and operate the U-Cord program throughout Mexico, Central
> America and Ecuador . . . As of November 2001, $200,000 was
> received. The remainder of the payments are due to be paid in two
> installments over a two-year period.
>
> *****
>
> In 2001 the Company sold an exclusive territorial license for Mexico,
> Ecuador and Central America for $600,000. As the obligations of the
> Company have been completed at November 30, 2001, the Company
> has recognized $500,000 in revenues and the balance will be recorded
> in operations in fiscal 2002.

-24-

78.     According to the May 31, 2002 Form 10-QSB, the Company recognized the remaining $100,000 in licensing fee income although only $200,000 of the $600,000 fee had been paid as of this May 31, 2002 date.

79.     As alleged above, when licenses are sold pursuant to a payment plan exceeding one year, there is a presumption under GAAP that collection of the sales price is not reasonably assured and that revenue thus may not be recognized.  The Company violated GAAP and materially overstated revenue and income by (1) prematurely recognizing the $500,000 Mexico license fee revenue during the fourth quarter of fiscal 2001, and (2) prematurely recognizing the $100,000 Mexico license fee revenue during the fiscal quarter ended May 31, 2002.

80.     Because the overstated revenue and earnings were not corrected through a charge to earnings during fiscal 2002, each and every financial statement the Company disseminated to the investing public during the fiscal year portrayed a picture of reported financial position and results of operations which continued to be materially misstated.

81.     Although the above discussed licensing agreements provided for the payment of royalties, each of the Company's financial statements which were disseminated to the investing public during the Class Period failed to disclose the Company's accounting policy with regard to the recognition of royalty income in contravention of GAAP (APB Opinion No. 22) as alleged above.

82.     Without disclosure to the contrary, investors were led to believe that licensees were making royalty payments to the Company on a periodic basis and that these payments were reflected in income.

83.    On October 21, 2002, it became apparent to investors that the Company had been accruing royalty revenue although no payments were actually being made by the licensee. According to the Company's Form 10-QSB filed on August 31, 2002 with the SEC:

> On September 26, 2002, the Company sent a letter to CRYO-CELL Europe, B.V. advising that CC-E was in default under the terms of the license agreement for failure to pay royalty fees. Based upon actual revenues since inception through July 2002, the Company is entitled to $350,585 in royalty fees. **Two payments were made in fiscal 2001 to the Company totaling $57,181 leaving a balance due of $293,404.** On October 2, 2002, the Company received a letter from CC-E stating that the Company had not fulfilled its obligations under the licensing agreement. As of August 31, 2002, a reserve of $128,540 was taken to offset the current royalty receivable.

84.    Each and every financial statement which the Company disseminated to investors during the Class Period was materially misstated because royalty income was recognized without an appropriate provision for uncollectible amounts.

85.    By failing to assess and appropriately provide for the impairment of the Company's revenue-sharing/license-fee receivables and royalty receivables, defendants intentionally or recklessly failed to provide for material loss provisions.

86.    Defendants also intentionally or recklessly caused the Company to fail to comply with the disclosure provisions of SOP 94-6 which requires a public Company that operates in more than one business to disclose the "relative importance of its operations in each business and the basis for the determination . . . of its assets, revenues or earnings." Cryo-Cell failed to disclose the "relative importance" of its revenue sharing, licensing, equipment sales, and other operations, and thus concealed the Company's fraudulent and non-GAAP accounting. This caused the overall impression

created by the financial statements to be inconsistent with the business realities of the Company's financial position and operations.

**D.     The Auditors Are Also Liable for the False Financial Statements**

87.     On March 16, 1999, defendant Mirsky Furst (predecessor to defendant Weinick Sanders) issued an audit report on the Company's financial statements as of, and for the fiscal year ended, November 30, 1998. This report contained an audit opinion which stated:

> In our opinion, the financial statements . . . present fairly, in all material respects, the consolidated financial position of CRYO-CELL International, Inc. and subsidiaries as of November 30, 1998 and 1997, and the consolidated results of their operations and their cash flows for the years then ended in conformity with generally accepted accounting principles.

88.     On February 28, 2000, defendant Weinick Sanders (successor to Mirsky Furst) issued an audit report on the financial statements of the Company as of, and for the fiscal year ended November 30, 1999 and failed to opine on the financial statements for the fiscal year ended November 30, 1999. This report contained an audit opinion which stated:

> In our opinion, the financial statements . . . present fairly, in all material respects, the consolidated financial position of CRYO-CELL International, Inc. and subsidiaries as of November 30, 1998 and 1997, and the consolidated results of their operations and their cash flows for the years then ended in conformity with generally accepted accounting principles.

89.     On February 2, 2001, defendant Weinick Sanders issued an audit report on the financial statements of the Company as of, and for the fiscal years ended November 30, 1999 and November 30, 2000. This report contained an audit opinion which stated:

> In our opinion, the consolidated financial statements . . . present fairly, in all material respects, the consolidated financial position of Cryo-Cell International, Inc. and subsidiaries as of November 30,

> 2000 and 1999, and the consolidated results of their operations and
> their cash flows for the years then ended in conformity with
> accounting principles generally accepted in the United States of
> America.

90.    On February 2, 2002, except for Note 4 as to which the date was February 22, 2002,

defendant Weinick Sanders issued an audit report on the financial statements of the Company as of,

and for the fiscal years ended November 30, 2000 and November 30, 2001.  This report contained

an audit opinion which stated:

> In our opinion, the consolidated financial statements . . . present
> fairly, in all material respects, the consolidated financial position of
> CRYO-CELL International, Inc. and subsidiaries as of November 30,
> 2001 and 2000, and the consolidated results of their operations and
> their cash flows for the years then ended in conformity with
> accounting principles generally accepted in the United States of
> America.

91.    The March 16, 1999 audit opinion issued by defendant Mirsky Furst and the February

4, 2000, February 2, 2001, and February 2, 2002 (except for Note 4 as to which the date was

February 22, 2002) opinions issued by defendant Weinick Sanders (the "Unqualified Audit

Opinions"), were materially false and misleading because the financial statements were not presented

in accordance with GAAP, nor were they audited in accordance with Generally Accepted Auditing

Standards ("GAAS").

92.    GAAS (AU Section 411), describes: "The Meaning of Present Fairly in Conformity

With Generally Accepted Accounting Principles in the Auditor's Report."  It states:

> The auditor's opinion that financial statements present fairly an
> entity's financial position, results of operations, and cash flows in
> conformity with generally accepted accounting principles should be
> based on his judgement as to whether (a) the accounting principles
> selected and applied have general acceptance; (b) the accounting
> principles are appropriate in the circumstances; (c) the financial

-28-

statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation...; (d) the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed...; and (e) the financial statements reflect the underlying events and transactions in a manner that presents the financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.

93.    As alleged above, Cryo-Cell's financial statements were not presented "fairly...in conformity with generally accepted accounting principles" because:

a.    Accounting principles selected and applied in the preparation of the Company's financial statements did not have general acceptance;

b.    Accounting principles which pervasively impacted the Company's financial statements were not appropriate in the circumstances;

c.    The Company's financial statements, including the related notes, were not informative of matters that affected their use, understanding, and interpretation; and

d.    The Company's financial statements did not reflect the underlying events and transactions in a manner that presented the financial position and the results of operations within a range of acceptable limits that were reasonable and practicable to attain in financial statements.

94.    Mirsky Furst and Weinick Sanders (the "Audit Firms") knew they were required to adhere to standards and principles of GAAS, including the requirement that their reports state whether or not the financial statements complied in all material respects with GAAP.

95.    The Audit Firms, in issuing their Unqualified Audit Opinions, as alleged herein, knew that by doing so they were engaging in a gross departure from GAAS, or issued such Unqualified Audit Opinions with reckless disregard for whether or not GAAS was being complied with.

96.    As alleged above, due to the materially false accounting which permeated the Company's financial statements during the Class Period, a reasonable investor was unable to perceive the true economic substance of the enterprise for which the financial statements were being presented. (SEC Accounting Series Release No. 173).

97.    In opining on the fairness of the Company's financial statements during the Class Period, the Audit Firms specifically represented that their audits included "assessing the accounting principles used...by management," as well as "evaluating the overall financial statement presentation." This representation was materially false and misleading because the Audit Firms either failed to assess the propriety of the accounting principles used by the Company and, thus, failed to consider the Company's use of non-GAAP accounting, or did so in an egregiously reckless manner.

98.    The Audit Firms' Unqualified Audit Opinions, insofar as they stated that the Audit Firms' audits of the Company's financial statements during the Class Period were conducted in accordance with GAAS, were false and misleading because the following GAAS (AU 150) were knowingly or recklessly violated:

a.    General Standard No. 1 was violated, which standard requires that the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

b.    General Standard No. 2 was violated, which standard requires that in all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

-30-

c.      General Standard No. 3 was violated, which standard requires that due professional care is to be exercised in the performance of the audit and in the preparation of the report.

d.      Standard Of Field Work No. 1 was violated, which standard requires that the work is to be adequately planned and assistants, if any, are to be properly supervised.

e.      Standard Of Field Work No. 2 was violated, which standard requires that a sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

f.      Standard Of Field Work No. 3 was violated, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.

g.      Standard Of Reporting No. 1 was violated, which standard requires that the report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

h.      Standard Of Reporting No. 3 was violated, which standard requires that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

99.     The Company was required to disclose in its financial statements the existence of the material facts alleged herein and to report transactions in conformity with GAAP. The Company failed to make such disclosures and to report transactions in conformity with GAAP. The Audit Firms were therefore required by GAAS to express a qualified opinion on the Company's financial

-31-

statements (AU Section 508) and, in so doing, to disclose to the investing public the nature and extent of the Company's non-GAAP accounting and to provide those disclosures which the Company's financial statements failed to provide.

100.    For example, the Company's financial statements failed to disclose the Company's accounting policy with regard to the recognition of license and royalty revenue, the relative importance of its operations in each business, and the fact that the Arizona/Florida transaction was a related party transaction. The Audit Firms failed to disclose these facts in qualified audit opinions on the Company's financial statements.

101.    The Audit Firms knew and ignored or recklessly disregarded the facts showing that the Company's financial statements during the Class Period were materially false and misleading for the reasons set forth above, and were presented in a manner which violated the principles of fair financial reporting and the GAAP specified herein.

102.    As particularized above, the Audit Firms failed to comply with GAAS in that it failed to perform its audits of the Company's financial statements during the Class Period with a proper degree of professional skepticism (AU Section 316). For example, the Audit Firms either identified and ignored or recklessly failed to identify the transaction alleged above which resulted in the improper recognition of $500,000 of revenue **on the last day of the Company's fiscal year** ended November 30, 1999. The Audit Firms continued to ignore or recklessly fail to identify the fact that the improper accounting for this transaction was not corrected, via a charge to earnings, during the audit of the Company's fiscal 2000 and fiscal 2001 financial statements.

103.    Further, as particularized herein, the Audit Firms either identified and ignored, or recklessly failed to investigate extremely questionable financial statement representations, and made

audit judgments that no reasonable auditor would have made if confronted with the same facts. For example, the Audit Firms either identified and ignored or recklessly failed to investigate the fact that an impairment of the Company's investment in CRYOC was not recognized when, in September 2000, the Company purchased a 6% equity interest in this company for $1,000,000 and in fiscal 2001 purchased a 1% equity interest in this company for $150,000. Accordingly, the Audit Firms' audits were so deficient that they amounted to no audit at all.

104.    Had the Audit Firms undertaken the performance of those audit procedures which were required by GAAS, and with the due professional care which was required by GAAS, they would have known that the Company's financial statements during the Class Period were materially false and misleading because these financial statements were not presented in accordance with GAAP.   In reckless disregard of professional standards, the Audit Firms failed to audit the Company's financial statements during the Class Period in conformity with GAAS.

105.    Due to the pervasive mosaic of non-disclosures, deceptive disclosures, and non-GAAP accounting, the above particularized financial statements which the Audit Firm audited and blessed through its Unqualified Audit Opinions and which the Company disseminated to the investing public during the Class Period were materially false and misleading for the reasons set forth above and because they violated the following GAAP concepts and principles:

a.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts No. 1).

-33-

b.      The concept that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Financial Accounting Concepts No. 1).

c.      The concept that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Financial Accounting Concepts No. 2).

d.      The concept of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Financial Accounting Concepts No. 2).

e.      The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Financial Accounting Concepts No. 2).

f.      The concept that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form (FASB Statement Of Financial Accounting Concepts No. 2).

g.      The concept that an expense or loss is required to be recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated, or that a liability has been incurred or increased, without associated economic benefits (FASB Statement of Financial Accounting Concepts No. 5).

h.      The principle that losses be accrued for when a loss contingency exists (Statement of Financial Accounting Standards No. 5).

-34-

i.      The principle that if no accrual is made for a loss contingency, then disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred (Statement of Financial Accounting Standards No. 5).

j.      The principle that revenues should ordinarily be accounted for at the time a transaction is completed (Accounting Principles Board Opinion No. 10).

106.    On March 11, 2003, the Company dismissed Weinick Sanders Leventhal & Co., LLP as the Company's independent auditors and engaged Ernst & Young LLP to serve as the Company's auditors.

107.    The Company filed a Form 8-K on April 15, 2003 stating that it was evaluating its revenue recognition policies and was considering the need to restate its prior financial statements:

> The Company is currently evaluating certain revenue recognition accounting policies and determining whether or not it will have to restate its financial statements for certain previous periods. The Company is working diligently with the auditors in connection with the issue to determine the impact. Additionally, in the event of such restatement, revenue previously reported by the Company would be deferred. The issue, which the Company may be seeking SEC guidance on, could further delay the filing of the Form 10-QSB. If ultimately determined to be necessary, the restatements would possibly reduce revenue and income up to $1.1 million in fiscal 2001 and up to $400,000 in fiscal 2002. In addition, there could be a potential additional cumulative liability of up to $5.1 million recorded.

108.    The final shoe dropped on May 20, 2003, when the Company announced that its new auditor, Ernst & Young LLP had resigned. The Company also announced that it was working with its former auditor, defendant Weinick Sanders, on the Company's anticipated restatement of financial results.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

109.    At all relevant times, the market for Cryo-Cell common stock was an efficient market for the following reasons, among others:

a.    Cryo-Cell common stock was listed and actively traded, on the Nasdaq Small Cap, a highly efficient market under the symbol "CCELE";

b.    As a regulated issuer, Cryo-Cell filed periodic public reports with the SEC;

c.    Cryo-Cell stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.    Cryo-Cell regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

110.    As a result, the market for Cryo-Cell securities promptly digested current information with respect to Cryo-Cell from all publicly-available sources and reflected such information in Cryo-Cell's 's stock price.  Under these circumstances, all purchasers of Cryo-Cell common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

111.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as "forward-looking statements" when made.

-36-

Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Cryo-Cell who knew that those statements were false when made.

## SCIENTER ALLEGATIONS

112.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Cryo-Cell and its business practices, their control over and/or receipt of Cryo-Cell's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cryo-Cell were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading

-37-

nature of the information which they caused to be disseminated to the investing public. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances and operations. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

113.    The Individual Defendants engaged in such a scheme to inflate the price of Cryo-Cell common stock in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; and (ii) enhance the value of their personal holdings of Cryo-Cell common stock and options.

114.    In particular, defendant Daniel D. Richard, former CEO of the Company, derived substantial compensation from the Company during the Class Period, and he continues to do so under a 10-year consulting agreement with the Company.

115.    Defendant Richard received the following sums as compensation for the three most recent years of this employment with the Company:

| Year | Salary | Bonus |
|------|--------|-------|
| 2002 | $242,720[1] | |
| 2001 | $234,571 | $50,000 |
| 2000 | $188,767 | |

116.    Richard resigned as the Company's Chairman and CEO on January 29, 2003, and currently serves as Chairman and CEO of SCPT, a majority-owned subsidiary of Cryo-Cell. When Richard resigned from the Company, he entered into a contract with Cryo-Cell which, among other

_____

[1] Includes $100,000 for service as CEO of SCPT.

things, gave Richard a one-time payment of $250,000 retirement bonus and a conditional award of stock options to purchase up to 200,000 shares of the Company common stock. Most importantly, the agreement entitles Richard to a payment of $200,000 per year for 10 years for consulting services as CEO of SCPT; in the event Richard dies before the end of his 10-year consulting agreement, the $200,000 annual payment must be made to Richard's living trust.

117.    Upon information and belief, SCPT has no viable product or service. In July 2001 -- nearly two years ago -- the Cryo-Cell board announced that it would declare and distribute a stock dividend in the shares of the then wholly-owned SCPT subsidiary. According to the Company's Form 10-KSB/A (No. 2) for the fiscal period ended November 30, 2002, Cryo-Cell shareholders of record on August 31, 2001 are expected to receive a distribution of 3 shares of SCPT common stock for every 4 Cryo-Cell shares they owned on the record date. The dividend payment for this "spin off" of SCPT, however, has been delayed repeatedly because the SEC will not approve the Company's registration statement for the distribution, according to Company filings. According to the Company, it is still in the midst of responding to the SEC's second round of comments on the registration statement.

### FIRST CLAIM
**(Violations Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5 Promulgated Thereunder Against**
**All Defendants)**

118.    Plaintiff repeats and realleges each and every allegation contained above.

119.    Each of the defendants: (a) knew or recklessly disregarded material adverse non-public information about Cryo-Cell's financial results and then existing business conditions, which

was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Cryo-Cell.

120.    During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.    Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Cryo-Cell stock during the Class Period.

122.    Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cryo-Cell stock.  Plaintiff and the Class would not have purchased Cryo-Cell stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

## SECOND CLAIM

**Violation Of Section 20(a) Of The Exchange Act**
**Against Individual Defendants**
**Mercedes Walton, Gerald F. Maass, Jill M. Taymans,**
**Ed Modzelewski, Frederick C. S. Wilhelm,**
**Wanda D. Dearth, Junior Winokur, Daniel D. Richard,**
**Ronald Richard, Charles D. Nyberg and John V. Hargiss**

123.    Plaintiff repeats and realleges each and every allegation contained above.

124.    The Individual Defendants (Mercedes Walton, Gerald F. Maass, Jill M. Taymans,

Ed Modzelewski, Frederick C. S. Wilhelm, Wanda D. Dearth, Junior Winokur, Daniel D. Richard,

Ronald Richard, Charles D. Nyberg and John V. Hargiss) acted as controlling persons of Cryo-Cell

within the meaning of Section 20(a) of the Exchange Act. By reason of their senior executive and/or

Board positions they had the power and authority to cause Cryo-Cell to engage in the wrongful

conduct complained of herein.

125.    By reason of such wrongful conduct, the Individual Defendants, are liable pursuant

to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful

conduct, plaintiff and the other members of the Class suffered damages in connection with their

purchases of Cryo-Cell stock during the Class Period.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

1.    Determining that this action is a proper class action and certifying plaintiff as class

representative under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages in favor of plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

-41-

3.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees ands expert fees; and

4.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: June 19, 2003

VIANALE & VIANALE LLP

By: _____
Kenneth J. Vianale
Fla. Bar No. 0169668
5355 Town Center Road, Suite 801
Boca Raton, FL  33486
Tel: (561) 391-4900
Fax: (561) 368-9274
E-mail: kvianale@vianalelaw.com

Joseph H. Weiss
**WEISS & YOURMAN**
551 Fifth Avenue
New York, New York 10176
Tel:    (212) 682-3025
Fax:    (212) 682-3010

Jules Brody
Aaron Brody
Tzivia Brody
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022

**Attorneys for Plaintiff**

-42-

# PLAINTIFF CERTIFICATION

_____ ("Plaintiff") hereby states that:

1.     Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.     Plaintiff did not purchase any common stock/securities of **Cryo-Cell International, Inc.** at the direction of his/her counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     The following includes all of Plaintiff's transactions in **Cryo-Cell International, Inc.** common stock/securities during the class period specified in the complaint:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| Common Stock | | 6-27-2000 | 6.50 | 200 |
| " " | | 10-01-2001 | 5.25 | 300 |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.     Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this _17_ day of ___June___, 2003.

_Gerald Mardell_
                                                            Signature